IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

RENITA J. MACKALL,

*Plaintiff*,

v.

Civil Action No. ELH-12-1153

CAROLYN COLVIN

*Defendant*.

**MEMORANDUM OPINION**

Renita J. Mackall, plaintiff, has sued Carolyn Colvin, defendant, in her capacity as Acting

Commissioner of the United States Social Security Administration ("SSA"), pursuant to Title

VII of the Civil Rights Act of 1964, codified as amended at 42 U.S.C. §§ 2000e *et seq.  See* ECF

21 ("Amended Complaint" or "Am. Compl.").[1]  Plaintiff alleges employment discrimination

based on race (Count I) and unlawful retaliation (Count II).  She claims, *inter alia*, that a

performance evaluation in 2010 was a "downgrade" based on race, and that the evaluation

rendered her "ineligible" for a cash employee incentive award.  *Id.* ¶ 19.

In response to the original Complaint (ECF 1), defendant filed a "Motion to Dismiss or,

in the Alternative, for Summary Judgment."  *See* ECF 4.  As an exhibit to that motion, defendant

appended the Report of Investigation ("ROI No. 1") prepared by the Equal Employment

Opportunity Commission ("EEOC") in connection with an Equal Employment Opportunity

---

[1] Plaintiff initially filed suit against Michael J. Astrue, then the Commissioner of SSA.
ECF 1.   In plaintiff's Amended Complaint, ECF 21, she named Colvin, the Acting
Commissioner of SSA, as the defendant.  In June 2014, President Obama nominated Colvin to
serve as the Commissioner of SSA.  Her Senate confirmation is pending.

("EEO") complaint filed by plaintiff on or about July 28, 2010.[2]   As discussed, *infra*, that motion was administratively terminated.   *See* ECF 9; ECF 10.

After plaintiff filed her Amended Complaint, defendant filed another "Motion to Dismiss or, in the Alternative, Motion for Summary Judgment" (ECF 24) and a supporting memorandum (ECF 24-1) (collectively, the "Motion").   That Motion is now pending.   As an exhibit to the Motion, defendant submitted the Report of Investigation ("ROI No. 2") prepared by the EEOC in connection with an EEO complaint filed by plaintiff on January 25, 2011.[3]   Plaintiff opposes the Motion (ECF 32, the "Opposition"),[4] and has submitted nineteen exhibits.   They include, *inter alia*, the performance evaluations of plaintiff's co-worker, Tatia Little, and the declarations of plaintiff; plaintiff's former first-line supervisor, Heath Kelly; and Jeffrey Menzise, Ph.D., who is described as an expert "in the area of racial and cultural studies."   ECF 32-17 ¶ 1.   Defendant has replied (ECF 33, the "Reply").

The Motion has been fully briefed, and no hearing is necessary to resolve it.   *See* Local Rule 105.6.   For the reasons that follow, I will construe the Motion as one for summary judgment, and I will grant it.

## I.  Background

### A.  *Factual Background*[5]

---

[2] Due to the size of ROI No. 1, it was submitted only in paper format.   *See* "Notice of Lengthy Exhibit," ECF 4-2.

[3] Due to the size of ROI No. 2, it was submitted only in paper format.   *See* "Notice of Lengthy Exhibit," ECF 24-2.   Defendant did not resubmit ROI No. 1 as an exhibit to the pending Motion, but it remains part of the record.

[4] Plaintiff's Opposition was initially docketed at ECF 31, but was corrected and refiled at ECF 32.

[5] The factual summary derives largely from the Amended Complaint, unless otherwise noted.   From time to time in the factual summary, I point out instances where SSA denies or

Mackall, an African American woman, has worked for SSA since August 13, 1989. Am. Compl., ECF 21 ¶ 5. In 2007, she became a Program Expert in the Policy and Program Branch, Center for Program Support, at a pay grade of GS-13. *Id.* ¶¶ 5, 6.[6]

SSA's fiscal year and employer appraisal periods run from October 1 through September 30. *Id.* ¶ 7. SSA utilizes a three-tiered rating system to evaluate the performance of its employees. *See* National Agreement of 2005 between SSA and the American Federation of Government Employees Art. 21 ("Collective Bargaining Agreement"), ROI No. 2 at 328-342; Reply, ECF 33 at 8. Level 5, the best rating, corresponds to Outstanding Contribution; Level 3 corresponds to Successful Contribution; and Level 1 refers to a rating of Not Successful. Collective Bargaining Agreement, ROI No. 2 at 328. Pursuant to the terms of the Collective Bargaining Agreement, "An appraisal rating of at least 'Successful' is required in order to be considered for awards and/or promotions." *Id.* at 328. But, an employee must "earn a 4.0 or above" to receive a Recognition of Contribution Award. Management Affidavit of Jack Leuchtman dated April 29, 2011 ("Leuchtman Affidavit"), ROI No. 2 at 133.[8]

From 2007 through June 2009, plaintiff's supervisor was Heath Kelly, an African American male who held the position of Program Manager in the Center for Program Support. Am. Compl., ECF 21 ¶ 7. He served as plaintiff's first-line supervisor for the 2008-2009 year. *Id.* ¶ 12. In October 2009, Kelly proposed a performance assessment score for plaintiff of 5.0 for the fiscal year ending September 30, 2009. *Id.* ¶¶ 7, 31. This is the best possible assessment

---

disputes plaintiff's contentions. These factual disputes are included for informational purposes, but are not material, for the reasons discussed, *infra.*

[6] Plaintiff began working for SSA as a GS-5, and has steadily progressed within the agency. Am. Compl., ECF 21 ¶ 6. Since October 2012, plaintiff has been employed as a Program Analyst in the Office of Electronic Services and Technology. Opposition, ECF 32 at 3.

[8] As discussed, *infra*, Leuchtman was Mackall's third-line supervisor during the events in question. Am. Compl., ECF 21 ¶ 8.

score.  *Id.*  But, he was allegedly told by his supervisor, Center Director Billy Donner, to reduce plaintiff's final score to 4.5.  *Id.* ¶ 7.  Nevertheless, based on that score, plaintiff received a Recognition of Contribution Award in 2009, a cash award based on her performance for that year. *Id.* ¶ 42.[9]

As of October 2009, there was a change in management of the Center for Program Support, along with a change as to Mackall's team of supervisors.  *Id.* ¶ 8.  Keerti Sulibhavi, a woman of Indian descent, replaced Mr. Kelly as plaintiff's first-line supervisor; Jacqueline Ruiz, who is Hispanic, became plaintiff's second-line supervisor; and Jack Leuchtman, a white male, was her third-line supervisor.  *Id.*

On or about May 17, 2010, Sulibhavi provided Mackall with her mid-year performance assessment for fiscal year 2010.   *Id.* ¶ 9.   According to plaintiff, the assessment was "unremarkable in its absence of any negative comment, with indication that Plaintiff's performance in some areas of work merited favorable comment." *Id.*  Ms. Sulibhavi stated in a "Management Affidavit" dated May 4, 2011 ("Sulibhavi Affidavit"), ROI No. 2 at 112-120, that the review was "positive," but she also claimed that she identified areas for plaintiff's improvement in Interpersonal Skills and Achieving Business Results.  *Id.* at 114.

Less than a month later, on or about June 11, 2010, Sulibhavi provided Mackall with an "optional" mid-year performance assessment for fiscal year 2010.  Am. Compl., ECF 21 ¶ 10.[10] Sulibhavi allegedly "gave no reason" for another assessment.   *Id.*  Sulibhavi commented that Mackall's "'non-courteous responses were noticed when [her] manager attempted to communicate on several occasions.'"  *Id.*  She also noted that plaintiff had become "'unreceptive

---

[9] The dollar amount of the Recognition of Contribution Award is not apparent from the parties' pleadings or the record.

[10] The evaluation is "optional" on the part of the employer, not the employee.

to change initiatives and management requests and inquiries, which indicate [her] unwillingness to conform to new initiatives."'  *Id.*; *see also* PACS Performance Plan: Non-Managers Performance Discussion dated June 11, 2010 regarding Renita Mackall ("Optional Assessment"), ROI No. 2 at 158-59.[11]  According to Mackall, this "sharply critical" Optional Assessment reflected a "decided shift from the favorable tone" apparent in the initial mid-year assessment prepared less than one month earlier.  Am. Compl., ECF 21 ¶ 10.[12]

During the meeting on June 11, 2010, Mackall asked Sulibhavi for specific examples to explain the basis for the unfavorable performance review in her Optional Assessment, and "the failure of management to address such concerns in the mid-year assessment given just 18 work days earlier," on May 17, 2010.  Am. Compl., ECF 21 ¶ 11.  When Sulibhavi did not offer any "specific corroboration," plaintiff "pressed the discussion further without substantive response. . . ."  *Id.*; *see* Opposition, ECF 32 at 7 n.5.  Because of the absence of "specific corroboration," plaintiff characterized Sulibhavi's comments in the evaluation as "'lies'" and claimed that "the failure of management to address such concerns in the mid-year assessment reflected poorly on the competence of management."  Am. Compl., ECF 21 ¶ 11; *see* Opposition, ECF 32 at 7 n. 5.[13]  As a result of Ms. Mackall's comments to Sulibhavi, and as discussed, *infra*,

---

[11] PACS is an abbreviation for Performance Assessment and Communication System.  It is the SSA system through which SSA employees are evaluated.  Collective Bargaining Agreement, ROI No. 2 at 328.

[12] In Sulibhavi's Affidavit, contained in ROI No. 2, Sulibhavi claimed that she held the "optional discussion" because "improvements identified in the first discussion on May 17 did not seem to be occurring, and the lack of improvement was beginning to impact [plaintiff's] overall performance."  Sulibhavi Affidavit, ROI No. 2 at 114.

[13] Ms. Sulibhavi claims that she never had the opportunity to discuss anything "at length" with plaintiff because Ms. Mackall "abruptly stopped the discussion" and accused Ms. Sulibhavi of "incompetence" and called her "'a liar.'"  Sulibhavi Affidavit, ROI No. 2 at 114.  Ms. Sulibhavi also alleges that plaintiff said the meeting was "'just bull'" and left "before [Ms.

Ms. Mackall received a written reprimand for "conduct unbecoming a federal employee." ECF 21 ¶ 11.

Following Mackall's meeting with Sulibhavi, Mackall sought an explanation from Leuchtman, her third-line supervisor, for the "negative performance optional assessment." *Id.* ¶ 13.[15]  In response, Leuchtman highlighted an incident that transpired at a meeting on May 20, 2010, attended by plaintiff, Little, and Ruiz, among others. *Id.* ¶¶ 13, 14.  The purpose of that meeting was to brief SSA Associate Commissioner Carolyn Simmons on a particular project. *Id.* ¶ 14.  Simmons is African American and, on the SSA hierarchy, she outranks plaintiff's chain of supervisors, including Ruiz. *Id.*

According to plaintiff, in response to an interruption from Ruiz, Simmons peered at Ms. Ruiz over her glasses and stated: "'Let me make myself clear.'" *Id.* ¶ 14.  Mackall observed that, for the rest of the meeting, Ruiz did not speak and appeared as though she had been "rebuked." *Id.*  Plaintiff also contends that she and her co-worker, Tatia Little, remained quiet for the duration of the meeting. *Id.* ¶ 16.  Nonetheless, Leuchtman claimed that he had been advised that, during the meeting, Mackall and Little "had been rude or had made rude comments or gestures" to Ruiz, plaintiff's second-line supervisor. *Id.* ¶ 13.

Plaintiff alleges that, due to the exchange between Simmons and Ruiz during this meeting, Ruiz "was embarrassed, and harbored as a result racial *animus*" against Simmons, who, as indicated, is African American. *Id.* ¶ 15.  According to plaintiff, Ruiz then directed this "racial *animus*" towards plaintiff and Little, "the lowest ranking African American personnel in the room" during the meeting, who worked under the supervision of Ruiz. *Id.* ¶ 15.  Plaintiff

---

Sulibhavi] could provide examples and discuss opportunities [Ms. Mackall] would have to improve." *Id.*

[15] In the Amended Complaint, Mackall did not provide a date for her inquiry.

contends that, to the extent that Leuchtman was notified about allegedly rude behavior on the part of plaintiff and Little during the meeting of May 20, 2010, "these reports were made as the product of a motivation other than accurately reporting events." *Id.* ¶ 16.

According to plaintiff, a similar, nearly simultaneous optional evaluation and downgrade occurred with respect to Little, her African American colleague, who shared plaintiff's chain of supervisors. Am. Compl., ECF 21 ¶ 12.[16] She recounts in the Amended Complaint facts pertinent to Little's evaluations, including the overall assessment score of 4.0 that Little received from Mr. Kelly for 2009. *Id.*

Plaintiff explains that on or about May 19, 2010, Little testified as a witness at a Merit Systems Protection Board and EEO hearing in support of Delinda Morrison, an SSA employee who alleged discrimination by the agency. *Id.* ¶ 17. According to plaintiff, Little's appearance at this proceeding was known to Sulibhavi and made known to Ruiz. *Id.*[17] Yet, on May 28, 2010, when Little received her mid-year performance assessment for fiscal year 2010 from Sulibhavi, the assessment was "generally favorable" and "lacked any general or specific negative comment." *Id.* ¶ 12.

On June 10, 2010, the final proceeding in Morrison's EEO hearing took place. *Id.* ¶ 18. The next morning, June 11, 2010, Little received an optional performance assessment from Sulibhavi, although Little had been present in the office for only five days following her mid-year assessment of May 28, 2010. *Id.* ¶ 12. Akin to Mackall's Optional Assessment, Little's optional assessment allegedly reflected a perceptible shift from the "generally favorable"

---

[16] Little and plaintiff are represented by the same attorney.

[17] In Sulibhavi's Affidavit of May 4, 2011, Sulibhavi averred that she was "not familiar with Delinda Morrison or any EEO Complaint that she may have filed." ROI No. 2 at 115.

assessment only days earlier.  *Id*.  When Little asked Sulibhavi for an explanation for the change, Sulibhavi offered "no answers of substance."  *Id*.

As indicated, with respect to the events of June 11, 2010, involving Sulibhavi's Optional Assessment of plaintiff, SSA issued a "written reprimand" to Mackall on June 29, 2010, for "conduct unbecoming a federal employee."  Am. Compl., ECF 21, ¶ 11; *see also* ROI No. 1 at 164-65 ("Letter of Reprimand").   In the Letter of Reprimand, plaintiff was advised that "[a]busive language is unacceptable and detracts from the agency's ability to maintain a safe and productive work environment."  ROI No. 1 at 165.  SSA informed plaintiff that she must "treat coworkers and the public with courtesy and respect at all times" and warned her that if such misconduct persisted, she could be subject "to a more severe disciplinary action."  *Id*.  The Letter of Reprimand also stated that it would be placed in plaintiff's "Official Personnel Folder . . . for up to two (2) years."  *Id*.

Plaintiff alleges that the negative assessment she received in the June 11, 2010 optional review was "carried . . . on through to the year-end review" on October 28, 2010.  Am. Compl., ECF 21 ¶ 19.  Mackall received a final performance assessment score of 3.5 for the 2010 fiscal year, which was a full point below "the compromised assessment" for 2009.  *Id*.  According to Mackall, her downgraded performance assessment was "done without basis in actual performance."  *Id*. ¶ 20.  Further, she claims that the assessment rendered her "ineligible" to receive the Recognition of Contribution Award for her performance during the 2010 fiscal year. *Id*. ¶ 19; *see also id*. ¶ 31.

As indicated, a score of 3.5 would be considered within the Successful tier, *see* Collective Bargaining Agreement, ROI No. 2 at 328, but an employee must "earn a 4.0 or above" to receive a Recognition of Contribution Award.  Leuchtman Affidavit, ROI No. 2 at 133.  However, with

an assessment score within the Successful range, Mackall remained eligible for other awards, such as the "Exemplary Contribution or Service Award."[18]  *Id.*  Nonetheless, in his Affidavit of April 2011, Leuchtman averred that "no awards have been issued for the rating year that ended in September 2010 for budgetary reasons."  *Id.*  Similarly, Sulibhavi provided the same information.  *See* Sulibhavi Affidavit, ROI No. 2 at 118.  Leuchtman added:  "So, no one has received awards for that period yet."[19]  Leuchtman Affidavit, ROI No. 2 at 133.

Plaintiff maintains that the quality of her performance did not change between 2009 and 2010, Am. Compl., ECF 21 ¶ 28, and that the downgrade was based on race, *id.*, and "for impermissible reasons of racial retribution and/or unlawful retaliation."  *Id.* ¶ 20.  She also claims that the Letter of Reprimand was "unjustified" and based on "racial *animus*."  *Id.* ¶ 29. Notably, however, plaintiff does not allege in her suit that she was contractually entitled to a bonus or an incentive award.  Moreover, she does not claim that she sustained a reduction in salary or pay grade or was deprived of a promotion as a result of her 2010 performance assessment or the Letter of Reprimand.  Nor has she disputed Leuchtman's assertion that, for budgetary reasons, no awards were conferred for the rating year ending September 2010.  And, plaintiff does not dispute that, at the meeting on June 11, 2010, she accused Ms. Sulibhavi of being a liar.  *See*, *e.g.*, Am. Compl., ECF 21 ¶¶ 31-34.

## B.  Procedural Background

As indicated, plaintiff was subjected to an optional mid-year performance assessment for fiscal year 2010 on June 11, 2010, which she claims resulted in a "downgrade" of her overall

---

[18]  In his Affidavit of April 2011, Leuchtman stated that, with a score of 3.5 Mackall remained eligible for the "Exemplary Contribution or Service Award."  But, he did not indicate whether that award is monetary.  Leuchtman Affidavit, ROI No. 2 at 133.

[19]  Leuchtman also asserted:  "Ms. Mackall's performance evaluation was based solely on her performance."  ROI No. 2 at 133.  And, he denied that Ms. Little's "EEO activity" was considered as part of plaintiff's evaluation.  *Id.*

assessment score, issued at the year-end review on October 28, 2010.  Following the events of June 11, 2010, plaintiff contacted an EEO counselor on June 17, 2010, to complain about the mid-year performance evaluation.  Am. Compl., ECF 21 ¶ 21; *see* ROI No. 1 at 39.  After plaintiff received the Letter of Reprimand on June 29, 2010, she also complained about the letter.  ROI No. 1 at 43.  The parties subsequently participated in informal EEO counseling and, on July 27, 2010, plaintiff received a notice of her right to file a formal EEO complaint of discrimination.  *Id.* at 49-51.  Plaintiff filed her first EEO complaint on July 28, 2010 ("First EEO Complaint").  *Id.* at 31.

The matter "continued administratively in a contested proceeding" before the EEOC.  Am. Compl., ECF 21 ¶ 21.  On October 13, 2011, the administrative judge ruled in favor of SSA, without a hearing, with respect to plaintiff's First EEO Complaint.  *Id.*  On March 15, 2012, SSA issued a final order adopting that decision.  *Id.*  Plaintiff filed this suit a month later, on April 16, 2012, pertaining only to the 2010 mid-year evaluation and the Letter of Reprimand.  *See* ECF 1.

On November 23, 2010, after plaintiff received her performance assessment of October 28, 2010, for the fiscal year ending September 2010, plaintiff contacted an EEO counselor.  *See* ROI No. 2 at 62; *see also* ECF 21 ¶ 22.  The parties subsequently participated in informal EEO counseling and, on January 14, 2011, plaintiff received notice of a right to file a formal EEO complaint of discrimination.  ROI No. 2 at 62-75; 77.  Plaintiff filed that EEO complaint on January 25, 2011 ("Second EEO Complaint").  *Id.* at 52.

On December 11, 2012, the EEOC denied SSA's motion to dismiss and directed that Mackall be afforded an administrative hearing as to her Second EEO Complaint.  Am. Compl., ECF 21 ¶ 22.  Although the administrative hearing was initially scheduled for April 3, 2013, it was postponed to enable the EEOC to rule on SSA's renewed motion to dismiss the

administrative action.  *Id.*  Since April 3, 2013, the EEOC has taken no further action to dispose of Mackall's Second EEO Complaint, despite the "best efforts" of both parties.  *Id.*[20]

When plaintiff filed suit in this case on April 16, 2012, it pertained only to the First EEO Complaint.  *See* ECF 1.  At that time, the Second EEO Complaint was pending with the EEOC. On October 23, 2012, defendant filed a motion to dismiss or, in the alternative, for summary judgment, *see* ECF 4, along with ROI No. 1.[21]  Thereafter, on January 4, 2013, the parties filed a "Consent Motion To Stay Proceedings," pending the outcome of the EEOC proceedings in connection with plaintiff's Second EEO Complaint.  ECF 9.  I approved the parties' joint request for a stay.  *See* ECF 10 (Order).  However, because the EEOC proceedings as to the Second EEO Complaint were pending indefinitely, without a final resolution, the parties filed a status report on August 30, 2013, asking that "this litigation should commence again, at least to the extent that Plaintiff shall respond to the pending agency motion to dismiss the complaint."  *See* ECF 13.[22]

Plaintiff also sought leave to amend her complaint to update it.  ECF 15.  That motion was granted.  ECF 16.  On November 4, 2013, plaintiff filed the Amended Complaint (ECF 21), adding claims related to the fiscal year 2010 performance evaluation, which are the subject of her

---

[20] On September 30, 2013, the parties stipulated that plaintiff exhausted all remedies as to her allegations in this suit. *See* ECF 21 ¶ 22.

[21] Although suit was filed on April 16, 2012, defendant was not served until August 28, 2012.  See ECF 3.

[22] In a status report of August 30, 2013, ECF 13, the parties sought to proceed with respect to defendant's original motion, i.e., ECF 4.  However, in light of their consent motion to stay the case pending resolution of the proceedings before the EEOC, ECF 9, the initial motion (ECF 4) was administratively closed by Order of January 4, 2013.  ECF 10.  Therefore, by marginal Order of August 30, 2013, ECF 14, I directed defendant to refile its motion.  In my view, that Order had the effect of lifting the stay.

Second EEO Complaint.[23]   *See* Am. Compl., ECF 21.   As noted, defendant responded with the Motion at issue here.   ECF 24.

Additional facts are included in the Discussion.

## II. Standard of Review; Plaintiff's Request for Discovery

Defendant's Motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment pursuant to Fed. R. Civ. P. 56.   *See* ECF 24 at 1; ECF 24-1 at 5-6.   Ordinarily, a court "is not to consider matters outside the pleadings . . . when ruling on a motion to dismiss" under Rule 12(b)(6).   *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007); *see Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013).   But, a motion such as the one here, styled in the alternative, implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure to consider documents outside the pleadings.   *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37, (D. Md. 2011), *aff'd*, 684 F.3d 462 (4th Cir. 2012).

If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."   Fed. R. Civ. P. 12(d).   However, when the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur.   In that circumstance, the court "does not have an obligation to

---

[23] Despite the lack of a right to sue letter in connection with the Second EEO Complaint, exhaustion is not at issue here.   To satisfy exhaustion when no final action is taken by the EEOC, an employee need only wait 120 days from the date of filing an EEO complaint prior to initiating a civil suit.   29 C.F.R. § 1614.310(g).   Moreover, SSA does not contend that plaintiff has failed to exhaust her administrative remedies.

notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).[24]

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.* at 165-67.

Even if the court were to construe the Motion under Rule 12(b)(6), the court may consider materials that are "integral to the complaint and authentic." *U.S. ex rel. Oberg v. Pennsylvania Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014) (quoting *Philips v. Pitt Cty Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)); *see Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014). To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis in original).

---

[24] In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so. *See Laughlin*, *supra*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials.").

Throughout her Amended Complaint, plaintiff refers to her performance evaluations and the Letter of Reprimand of June 29, 2010. Indeed, these documents form the basis for plaintiff's discrimination claims. *See, e.g.*, Am. Compl., ECF 21 ¶¶ 10-11, 19, 21-22, 26-27, 28-31, 37, 39-40. Although plaintiff did not append these documents to the Amended Complaint (ECF 21), SSA submitted them as part of ROI No. 1 and ROI No. 2. *See* Letter of Reprimand, ROI No. 1 at 164-66; Optional Assessment, ROI No. 2 at 158-59. Plaintiff does not dispute the authenticity of these documents. Therefore, I may consider these particular documents without converting the Motion to one for summary judgment. *See Sammarco v. Bd. of Educ. of Prince George's Cnty.*, Civil No. CCB-13-1079, 2013 WL 5274277, at *1 n.1 (D. Md. Sept. 16, 2013) (considering negative performance evaluations attached to motion to dismiss, and noting that plaintiff referenced the evaluations in her complaint in support of allegations and did not dispute their authenticity), *aff'd*, 556 Fed. App'x 200 (4th Cir. 2014) (*per curiam*), *cert. denied*, ____ U.S. ____, 135 S. Ct. 339 (2014).

As discussed, *infra*, the key issues in this case are whether Mackall's performance evaluation downgrade for the 2010 fiscal year and plaintiff's resulting ineligibility for a particular cash award constitute adverse employment actions under Title VII. Article 21 of the Collective Bargaining Agreement is part of ROI No. 2, submitted by SSA as an exhibit. ROI No. 2 at 328-42. It describes SSA's performance rubric and the assessment score necessary to be "considered" for any SSA award or promotion. *See id*. at 328. ROI No. 2 also includes the affidavits of Leuchtman and Sulibhavi, which provide, *inter alia*, information on SSA's award criteria. Leuchtman Affidavit, ROI No. 2 at 129-35; Sulibhavi Affidavit, ROI No. 2 at 112-20. As noted, Leuchtman and Sulibhavi also aver that no awards were made for fiscal year 2010, for

budgetary reasons.  Leuchtman Affidavit, ROI No. 2 at 133; Sulibhavi Affidavit, ROI No. 2 at 118.

Plaintiff does not dispute the authenticity of the Collective Bargaining Agreement, nor does she challenge the assertions in the affidavits as to SSA award criteria.  But, these documents are not integral to the Complaint.  Therefore, in order to consider these limited materials, conversion of the Motion to one for summary judgment would be necessary.  *See* Fed. R. Civ. P. 12(d).

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery."  *E. I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011).  In that circumstance, however, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'"  *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)).

To raise adequately the issue that discovery is needed prior to summary judgment, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition" without needed discovery.  Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).  And, "to justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'"  *Nguyen v. CNA Corp.*, 44 F.3d 234, 242 (4th Cir. 1995) (citation omitted).

Of relevance here, a non-movant's Rule 56 request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008). Moreover, denial of additional discovery is appropriate when the materials sought by the requesting party could have been discovered earlier, including in the course of administrative discovery. *See Volochayev v. Sebelius*, 513 Fed. App'x 348, 351-52 (4th Cir. 2013); *see also Newsom v. Barnhart*, 116 Fed. App'x 429, 432 (4th Cir. 2004) (affirming district court's denial of discovery request, "[g]iven the breadth of the administrative record"); *Khoury v. Meserve*, 268 F. Supp. 2d 600, 612 (D. Md. 2003) (determining that summary judgment was not premature because a "full and detailed factual record" had already been created).

Plaintiff has appended several exhibits to support her Opposition, ECF 32, such as the Declaration of Little, ECF 32-4; the Declaration of Heath Kelly, ECF 32-11; and the Declaration of Jeffrey Menzise, Ph.D., a proposed expert on racial matters in the workplace. ECF 32-17.  In large measure, the exhibits pertain to allegations of a racial motive in regard to the conduct of the performance evaluations and pretext.

In any event, despite plaintiff's own submission of several exhibits for the Court's consideration, she argues that summary judgment is not proper because she has not had an opportunity to conduct discovery. Opposition, ECF 32 at 17-18.  To support that assertion, plaintiff submitted a Rule 56(d) Declaration of her attorney, John H. Morris, Jr., dated April 14, 2014 (ECF 32-1, "First Morris Declaration").  There, Morris explains that the "primary issues" raised by the Motion concern whether plaintiff's FY 2010 appraisal was based on race or retaliation and

whether plaintiff can demonstrate that defendant's stated reasons are pretextual.  *Id.* ¶ 2.  Morris asserts a need to conduct discovery, and urges the Court not to construe the Motion as one for summary judgment.  But, his Declaration does not include requests for discovery pertinent to the issue of whether plaintiff suffered an adverse employment action.

In advocating for additional discovery, Morris avers, *inter alia*, that the "availability of adversarial discovery will permit the record to reflect a detailed account of the factual basis for the challenged assessment for FY 2010 and an evidentiary basis for the apparent urgency that compelled the optional mid-year appraisal . . . ."  First Morris Declaration, ECF 32-1 ¶ 14.d. Further, he contends that additional discovery will allow exploration of subsequent performance evaluations of Mackall and Little and, together with earlier assessments, will "call into question" the basis on which Leuchtman, Ruiz, and Sulibhavi evaluated both plaintiff and Little.  *Id.* at ¶ 12.  According to Morris, more recent, positive evaluations would provide useful points of comparison to the fiscal year 2010 evaluation, presumably to demonstrate that the 2010 evaluation was the product of racial animus.  *Id.*

Morris also seeks information about the meeting of May 20, 2010, with Associate Commissioner Simmons, and how Leuchtman came to learn of the alleged misconduct of Mackall and Little at the meeting, and the extent to which this alleged misconduct influenced Mackall's optional performance assessment.  *Id.* ¶ 14.a.  In particular, Morris argues, in part, *id.*:

> To the extent that Mr. Leuchtman was not present at the [May 20, 2010] meeting, discovery would provide relevant evidence by pinning down (1) whether Mr. Leuchtman can confirm that he made the statement [about Mackall and Little's alleged misbehavior at the meeting], and if so, (2) how he learned about the alleged misbehavior at the meeting, (3) who informed him, (4) when, relative to the decision to give Plaintiff and Ms. Little the negative optional mid-year assessments, did he get the information, (5) the relevance of such alleged misconduct, if true, to the given optional assessment, and (6) if the observation were not true, the extent to which such false information drove the decision to give the negative assessment.

In sum, Morris maintains that plaintiff had no "reasonable prior opportunity to conduct discovery." *Id.* ¶ 11.   His proposed discovery largely concerns efforts to gather facts to demonstrate that SSA was motivated by illegal race-based considerations in assessing plaintiff's performance, and that the proffered reasons for the agency's actions are merely pretextual.

Defendant counters that plaintiff had ample opportunity to engage in discovery at the administrative level, but chose not to do so.   Reply, ECF 33 at 19.   According to SSA, disposition of the Motion should not be delayed in order to permit plaintiff to conduct discovery. *Id.*

In consideration of the parties' positions, I sought to clarify the extent of discovery conducted by the parties at the administrative level as to each of plaintiff's EEO complaints. Therefore, I directed counsel to submit affidavits detailing the discovery previously conducted. *See* Order of November 17, 2014 (ECF 34).

In response, on November 21, 2014, defendant submitted the Declaration of Lucinda E. Davis (ECF 35, "Davis Declaration"), as well as thirty-three pages of exhibits.   *See* ECF 35 at 5-37.   Davis is currently a Supervisory Attorney, Office of General Law, in SSA's Office of the General Counsel.   ECF 35 ¶ 1.   And, she is the Agency attorney assigned to this case, and worked on the case during the administrative phase.   *Id.*   She relies, *inter alia*, on 29 C.F.R. § 1614.109(d), as authorizing administrative discovery.   *Id.* ¶ 4.   The exhibits submitted with the Davis Declaration include orders with respect to both administrative proceedings, announcing the commencement of discovery.   In addition, the exhibits reflect that Mackall was deposed twice by SSA—once on May 17, 2011, and again on December 20, 2011.   ECF 35 at 15, 36. Both times, Mr. Morris was in attendance.   ECF 35 ¶¶ 8, 17.

On November 24, 2014, in response to my inquiry, Mr. Morris submitted another Declaration (ECF 36, "Second Morris Declaration").  There, Morris explained why he failed to pursue depositions at the administrative level, amplified his claim that plaintiff is in need of discovery, but did not dispute Davis's factual assertions as to discovery.  ECF 36.  In addition to what is set forth above, the record reflects the following.

When plaintiff filed her First EEO Complaint on July 28, 2010, she was *pro se*.  But, Morris has represented plaintiff since November 2010, while the First EEO Complaint was still pending.  Second Morris Declaration, *Id.* ¶¶ 10-11.  As indicated, the First EEO Complaint concerned the optional mid-year review.  The discovery period as to the First EEO Complaint extended from March 1, 2011, to June 15, 2011.  Davis Declaration, ECF 35 ¶¶ 6-11.  Despite SSA's decision to depose Mackall during this period, and notwithstanding Morris's concerns about the motivation behind Mackall's optional mid-year performance, Morris initiated no discovery at the administrative level as to the First EEO Complaint.  *Id.* ¶ 12.  Morris seems to concede that this was because the "optional mid-year appraisal, standing alone, had no arguable adverse effect on the Plaintiff's employment status."  Second Morris Declaration, ECF 36 ¶ 9.

Morris continued to represent Mackall throughout the administrative proceedings as to the Second EEO Complaint.  *Id.* ¶ 11.  He also represented two of plaintiff's co-workers, Tatia Little and Delinda Morrison. First Morris Declaration, ECF 32-1 ¶ 3.  As to the Second EEO Complaint, SSA conducted depositions[26] and counsel exchanged requests for production of

---

[26] Plaintiff indicates that she testified at her deposition about the May 20, 2010, meeting with Associate Commissioner Simmons.  Opposition, ECF 32 at 8 n. 6.  But, she contends she "cannot afford to purchase the transcript in question."  *Id.*  As a result, she "moves that the EEOC direct that the agency provide a full copy of the deposition to the EEOC and the Plaintiff's counsel, and counsel would be happy to supply the relevant page references to the EEOC."  *Id.*  Plaintiff's request is denied as moot because, as discussed, *infra,* notwithstanding

documents and written interrogatories.  Davis Declaration, ECF 35 ¶¶ 14-17.  But, Morris only pursued written requests for information.  *Id.* ¶¶ 14, 18.  Morris offers this explanation as to why he limited his discovery, Second Morris Declaration, ECF 36 ¶ 6:

> At the time discovery was being conducted in the [second] administrative proceeding, I had every expectation that this matter would proceed to a hearing where witnesses Leuchtman, Ruiz, and Sulibhavi could be examined and their testimony there explored without having to engage a court report[er] and assume the cost of the examination.

Further, he posits, *id.* at ¶ 15:

> In the peculiar history and posture of this case, that Plaintiff has previously been unable to examine witnesses Leuchtman, Ruiz, and Sulibhavi was not fairly the result of not deposing them prior to any hearing, but rather the result of the curious action by the Administrative Judge to take no action to conclude this administrative case with a hearing despite having initially denied the Defendant's motion for summary disposition of the Plaintiff's discrimination charge.

Morris has also expressed concerns about the lack of opportunity to depose plaintiff's supervisors if their comments "are to be credited." *Id.* ¶ 16.  Morris adds that, under the circumstances, he thought it "reasonably likely" that a hearing would be held by the EEOC, obviating the need to conduct depositions.  *Id.* ¶ 12.

Lawyers routinely make strategic decisions in regard to their cases.  As a matter of strategy, Morris chose not to conduct depositions of plaintiff's supervisors.  As to the Second EEO complaint, Morris hedged his bets that an administrative hearing would be held, at which time he could obtain discovery without having to pay for it.  It was a calculated decision, and Morris concedes it was meant to enable him to avoid deposition costs.  *Id.* ¶ 6.  Ultimately, however, no administrative hearing was held, and so the strategy did not work.  Am. Compl., ECF 21 ¶ 22.

what transpired at the May 20, 2010 meeting, plaintiff cannot establish an adverse employment action.

In *McCray v. Maryland Dep't of Transp.*, 741 F.3d 480, 483 (4th Cir. 2014), the Fourth

Circuit determined, *inter alia,* that the district court abused its discretion in dismissing an action

before the plaintiff had an opportunity to conduct discovery in connection with a Rule 56(d)

motion. *Id.* at 483. The *McCray* Court noted, *id.*: "Summary Judgment before discovery forces

the non-moving party into a fencing match without a sword or mask." The Court reasoned, *id.* at

484 (internal citations omitted):

> Non-movants must generally file an affidavit or declaration before they can
> succeed on a 56(d) motion, or if not, non-movants must put the district court on
> notice as to which specific facts are yet to be discovered. In this case, McCray
> filed such a declaration and identified the material she needed to discover….
> *Similarly, nonmovants do not qualify for Rule 56(d) protection where they had the
> opportunity to discover evidence but chose not to.* There is no indication that
> McCray's inability to gather evidence was due to her own delay. In sum, . . .
> McCray's 56(d) motion should be granted. (Emphasis added).

*See also Harrods*, 302 F.3d at 246 (noting that non-movant was entitled to 56(d) protection in

part because it "was not dilatory in pursuing discovery").

Judge Blake's decision in *Kowalewski v. Gates*, CCB-12-3288, 2014 WL 1212972 (D.

Md. Mar. 24, 2014), is quite instructive. Plaintiff Todd Kowalewski, who is white, brought suit

under Title VII and 42 U.S.C. § 1981, alleging discrimination based on race and gender, hostile

work environment, and retaliation for protected activity. *Id.* at *1. In particular, the plaintiff

claimed he was constructively discharged. *Id.*

The plaintiff was hired in 2009 by defendant, National Geospatial-Intelligence Agency

("NGA"), as a staff officer for a two-year probationary period. *Id.* at *1. According to

Kowalewski, his supervisor, Lynn Griffin-Bell, an African American woman, deprived him of a

number of opportunities to further his career, such as removing him from an advanced clearance

assignment. *Id.* at *3. Instead, she gave the coveted assignment to an African American co-

worker, who Kowalewski alleged was not qualified for the job. *Id.*

- 21 -

In March 2010, before Kowalewski's probationary period expired, Kowalewski resigned and filed a complaint against NGA with the EEOC, alleging, *inter alia*, employment discrimination on the basis of race and gender. *Id.* at *1. At the administrative level, discovery lasted more than eleven months, and the case itself spanned seventeen months. *Id.* at *7. During this time, Kowalewski elected not to depose his supervisor, Griffin-Bell, even though Kowalewski was deposed by the defendant. Eventually, Kowalewski brought a civil suit against NGA. In response to NGA's motion to dismiss or for summary judgment, Kowalewski filed a Rule 56(d) motion requesting an opportunity for discovery. He sought, among other things, an opportunity to depose Griffin-Bell. *Id.* at *8.

Judge Blake denied Kowalewski's Rule 56(d) motion. *Id.* at *7-8. She explained: "Denial of additional discovery is appropriate, . . . when the materials sought by the requesting party could have been discovered earlier, including in the course of administrative discovery." *Id.* (citations omitted). Moreover, Judge Blake noted that the plaintiff had sufficient time for discovery at the administrative phrase. *Id.* And, all of the information that the plaintiff sought at the trial level could have been obtained "had he pursued administrative discovery more diligently." *Id.* at *8. The court also found that the administrative record in the case was sufficiently developed to make a summary judgment determination. *Id.* at *7. In this regard, the investigative file contained over 500 pages, including sworn affidavits from several critical witnesses. *Id.* at *8.

This case is factually distinguishable from *McCray* and quite similar to *Kowalewski*. Like the plaintiff in *Kowalewski*, plaintiff had ample opportunity to discover the requested information during the EEOC proceedings. Indeed, there were two periods of administrative discovery and collectively they spanned many months. As to the Second EEO Complaint, which

- 22 -

is the focus here, plaintiff sought to avoid the costs of discovery, in expectation of an evidentiary hearing that never materialized.  Nevertheless, the reality is that plaintiff had ample opportunity to conduct discovery at the administrative level and chose not to pursue it.

Moreover, the administrative record here is well developed, spawned by both of plaintiff's EEO complaints and ensuing investigations.  The results of the EEOC investigations exceed 500 pages, and include plaintiff's claims of discrimination and retaliation, the resolution of the first claim at the agency level, and affidavits from those Mackall accused of misconduct. *See* ROI No. 1; ROI No. 2.  In addition, Mackall was deposed, in the presence of her attorney. Defendant does not rely on any evidence beyond what is contained in the administrative record. Davis Declaration, ECF 35 ¶ 19.

In any event, I am not persuaded that the evidence sought by plaintiff through discovery would create a genuine issue of material fact sufficient to defeat summary judgment.  *See Strag*, *supra*, 55 F.3d at 954.  This is because the proposed discovery, seeks to investigate the claims of discriminatory motive and alleged pretext with respect to plaintiff's performance evaluations and the Letter of Reprimand.  First Morris Declaration, ECF 32-1 ¶ 14.  But, the issues of motive and pretext play no role in my ruling.

In converting the Motion to one for summary judgment, I do not (and need not) rely on defendant's evidence controverting or disputing plaintiff's claims of racial animus and pretext in regard to her performance evaluations or the Letter of Reprimand.  Indeed, I need not consider most of the evidence gathered below.  This is because I do not reach issues of motive or pretext. Instead, I focus on the preliminary issue of the requisite adverse employment action.  *See Amirmokri*, *supra*, 437 F. Supp. 2d at 420 ("The law is clear that to prevail on either [a discrimination or retaliation] theory of recovery, Plaintiff must first establish that [she] suffered

some adverse employment action.").  Significantly, none of the information sought by Morris in discovery would remedy plaintiff's failure to establish an adverse employment action.  As a result, I see nothing but delay and unnecessary expense if I were to grant plaintiff's request for discovery as to the lines of inquiry proposed by Mr. Morris.  *See*, *e.g.*, First Morris Declaration, ECF 32-1 ¶ 14.

This case could have been resolved as a motion to dismiss because, as explained, *infra*, plaintiff does not adequately allege that she sustained an adverse employment action.  But, I convert the Motion to one for summary judgment to take into consideration portions of three documents included in the administrative record pertaining to SSA's performance rubric and the award criteria.  These are the Collective Bargaining Agreement, ROI No. 2 at 328-342; Leuchtman Affidavit, ROI No. 2 at 129-135; and Sulibhavi Affidavit, ROI No. 2 at 112-120. The documents strengthen my conclusion.  And, because they are not integral to the Complaint, conversion to summary judgment is required in order for me to consider them.  *See* Fed. R. Civ. P. 12(d).

For all of these reasons, I deny plaintiff's request for discovery.  And, I will construe defendant's Motion under summary judgment principles.  I turn next to the standards that apply to summary judgment.

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  As the Fourth Circuit recently observed, Fed. R. Civ. P. 56 "is a mechanism to obviate trial . . . ."  *Boyer-Liberto v. Fontainbleau Corp.*, 752 F.3d 350, 355 (2014), *reh'g en banc granted* (July 1, 2014), *reargued* (September 18, 2014).

The Supreme Court has clarified that not every factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id*. at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). In resolving a motion for summary judgment, a district court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore*, 721 F.3d 264, 283 (4th Cir. 2013); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013). Moreover, the district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, *supra*, 477 U.S. at 249. And, the court may not make credibility determinations on summary judgment. *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

Generally, in the face of conflicting evidence, such as competing affidavits, summary judgment is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See, e.g.*, *Boone v. Stallings*, 583 Fed. App'x 174 (4th Cir. 2014) (per curiam). But, as noted, to defeat summary judgment conflicting evidence must give rise to a *genuine* dispute of *material* fact. *See Anderson*, *supra*, 477 U.S. at 247-48. So, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. Indeed, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Id.* In addition, the court should "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (citation and internal quotation marks omitted).

### III. Discussion

#### A. Title VII Methods of Proof

Title VII prohibits an employer from, *inter alia*, discriminating against "any individual with respect to his compensation terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1); *see Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 420 (4th Cir. 2014). As amended by the Civil Rights Act of 1991, Title VII expressly provides for "mixed-motive" liability, stating: "Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e–2(m).

In general, there are "two avenues" *at trial* by which a plaintiff may prove that an adverse employment action amounts to intentional employment discrimination. *Burns v. AAF–McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996), *cert. denied*, 520 U.S. 1116 (1997); *see Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004) (en banc). The first is to offer "'direct or indirect'" evidence of discrimination, under "'ordinary principles of proof.'" *Burns*, 96 F.3d at 731 (citations omitted). Absent such evidence, the second avenue available to the plaintiff is to follow the burden-shifting approach first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The *McDonnell Douglas* scheme is "a procedural device, designed only to establish an order of proof and production." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 521 (1993) (emphasis omitted). Under the *McDonnell Douglas* approach, the "ultimate burden of persuasion [at trial] never 'shifts' from the plaintiff" to prove intentional unlawful discrimination. *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 n.2 (4th Cir. 1989) (citation omitted).

Pursuant to the burden-shifting approach, the plaintiff at trial must establish a "prima facie case of discrimination" by a "preponderance of the evidence." *Mereish v. Walker,* 359 F.3d 330, 334 (4th Cir. 2004); *see Laing v. Fed. Exp. Corp*., 703 F.3d 713, 719 (4th Cir. 2013); *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010). Although the precise formulation of the required prima facie showing will vary in "differing factual situations," *McDonnell Douglas*, 411 U.S. at 802 n.13, the plaintiff in an employment discrimination suit is generally required to show that the employer took adverse action against the plaintiff "under circumstances which give rise to an inference of unlawful discrimination," *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

If the plaintiff establishes a prima facie case, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to produce evidence of a legitimate, non-discriminatory reason for its adverse employment action. *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted." *Burdine*, *supra*, 450 U.S. at 255. In that circumstance, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant" and "simply drops out of the picture." *St. Mary's Honor Ctr.*, 509 U.S. at 510-11. Stated another way, if the employer produces evidence that could persuade a fact finder that it had a legitimate, non-discriminatory reason for its actions, "the defendant has done everything that would be required of [it] if the plaintiff had properly made out a *prima facie* case," and therefore, "whether the plaintiff really did so is no longer relevant." *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711 (1983).

If the defendant meets the burden of production, the plaintiff must then prove, by a preponderance of evidence, "that the proffered reason was not the true reason for the employment decision," and that the plaintiff "has been the victim of intentional discrimination." *Burdine*, *supra*, 450 U.S. at 256; *see also Reeves*, 530 U.S. at 143; *St. Mary's Honor Ctr.*, 509 U.S. at 516-20; *Adams v. Trustees of Univ. of North Carolina–Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) ("[I]n demonstrating the Defendants' decision was pretext, [plaintiff] had to prove '*both* that the reason was false, *and* that discrimination was the real reason.'") (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)) (emphasis in original).[30]

─────────────────

[30] In *Adams*, a summary judgment case, the Court also said that the plaintiff "cannot rely on his 'own assertions of discrimination [, which] in and of themselves are insufficient to counter

These two approaches establish the common methods by which a plaintiff may prove intentional employment discrimination *at trial*.  *See Burns*, 96 F.3d at 731.  At the summary judgment or motion to dismiss stage, however, they merely serve to inform a court's evaluation of the allegations.  Indeed, an employment discrimination complaint need not include specific facts establishing a prima facie case of discrimination under the framework set forth in *McDonnell Douglas*.  *Swierkiewicz v. Sorema*, *N.A.*, 534 U.S. 506, 508 (2002).  Rather, to the extent that review is appropriate under Rule 12(b)(6), "to survive a motion to dismiss, the complaint must 'state a plausible claim for relief' that 'permit[s] the court to infer more than the mere possibility of misconduct' based upon 'its judicial experience and common sense.'" *Coleman v. Maryland Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd*, ____ U.S.____, 132 S.Ct. 1327 (2012) (citation omitted).  And, if defendant's contentions arise as arguments for summary judgment under Rule 56, the relevance of the prima facie case under *McDonnell Douglas* at the summary judgment stage is also limited.

The Fourth Circuit has admonished district courts to "'resist the temptation to become so entwined in the intricacies of the [*McDonnell Douglas*] proof scheme that they forget that the scheme exists solely to facilitate determination of the ultimate question of discrimination *vel non*.'" *Merritt*, 601 F.3d at 295 (quoting *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991)) (alterations in *Merritt*, internal quotation marks omitted).  The Court has observed that, "[n]otwithstanding the intricacies of proof schemes, the core of every [discrimination] case remains the same, necessitating resolution of 'the ultimate question of discrimination *vel non*,'" and that, "[b]y the time of appeal especially, the issue boils down to whether the plaintiff has

---

substantial evidence of legitimate nondiscrimatory reasons for an adverse employment action.'" 640 F.3d at 560 (citation omitted).

presented a triable question of intentional discrimination." *Merritt*, 601 F.3d at 294-95 (citation omitted).[31]

*Count I: Discrimination on the Basis of Race*

In Count I, plaintiff alleges that SSA "acted unlawfully against plaintiff, in violation of Title VII, by subjecting her, because of her race, to a factually unfounded downgrade in its assessment of her performance and in determining to reprimand her in writing for challenging that unfounded assessment." Am. Compl., ECF 21 ¶ 27 (Count I). Plaintiff also claims that the reduction in her performance evaluation rendered her ineligible for an employee cash incentive award. *Id.* at ¶ 31.

Defendant urges dismissal of plaintiff's claim, arguing that plaintiff has failed to allege that she suffered an adverse employment action as a result of the performance evaluations or Letter of Reprimand. *See* ECF 24-1 at 9-13. SSA cites various cases concluding that neither a performance evaluation nor a reprimand, standing alone, amounts to an adverse employment action. ECF 24-1 at 9-12.

Title VII serves to prevent an employer from taking an "adverse employment action" against an employee on a prohibited basis. *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir.), *cert. denied*, 543 U.S. 959 (2004). The Fourth Circuit has explained: "An adverse employment action is a discriminatory act that adversely affects the terms, conditions, or benefits

---

[31] On several occasions where the employer proffered evidence of a legitimate reason for its adverse action in its motion for summary judgment, the Fourth Circuit has assumed, without deciding, that the plaintiff established a prima facie case. *See, e.g.*, *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007), *cert. denied*, 552 U.S. 1102 (2008); *Hux v. City of Newport News*, 451 F.3d 311, 314 (4th Cir. 2006); *Laber v. Harvey*, 438 F.3d 404, 432 (4th Cir. 2006); *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 319-20 (4th Cir. 2005); *cert. denied*, 546 U.S. 1091 (2006); *Rowe v. Marley Co.*, 233 F.3d 825, 829 (4th Cir. 2000); *see also Geist v. Gill/Kardash P'ship*, 671 F. Supp. 2d 729, 736-37 (D. Md. 2009); *Spriggs v. Pub. Serv. Comm'n*, 197 F. Supp. 2d 388, 394 (D. Md. 2002).

of a plaintiff's employment." *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) (internal quotation marks, citation, and alterations omitted), *cert. denied*, 552 U.S. 1102 (2008).   Typically, an adverse employment action has been found in cases of "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion." *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999); *see also James*, 368 F.3d at 376.   "'Although conduct short of ultimate employment decisions can constitute adverse employment action, there still must be a tangible effect on the terms and conditions of employment.'" *Thorn v. Sebelius,* 766 F. Supp. 2d 585, 598 (D. Md. 2011) (quoting *Geist*, *supra*, 671 F. Supp. 2d at 737 (D. Md. 2009)), *aff'd*, 465 Fed. App'x 274 (4th Cir. 2012).

A reprimand is considered a "tangible employment action" only when "evidence shows that a reprimand not only bruises an employee's ego or reputation, but also works a real, rather than speculative, employment injury." *Lewis v. Forest Pharms., Inc.*, 217 F. Supp. 2d 638, 648 (D. Md. 2002); *see Newman v. Giant Food, Inc.*, 187 F. Supp. 2d 524, 529 (D. Md. 2002) (plaintiff could not establish that the verbal warning or counseling letter he received for arriving late was an adverse action "without evidence that the warning could lead to further disciplinary action, such as termination"), *aff'd sub nom. Skipper v. Giant Food Inc.,* 68 Fed. App'x 393 (4th Cir. 2003); *Nye v. Roberts*, 159 F. Supp. 2d 207, 214 (D. Md. 2001) (finding a letter of reprimand did not amount to an adverse employment action, where the letter only requested that the plaintiff correct her behavior, and "did not state that it would lead to her termination or demotion or a decrease in pay"), *vacated on other grounds*, 47 Fed. App'x. 247 (4th Cir. 2002).

Here, as indicated, SSA issued a Letter of Reprimand to Mackall on June 29, 2010, for "[c]onduct [u]nbecoming of a [f]ederal [e]mployee," based on plaintiff having called Sulibhavi a

"liar" and "incompetent." Letter of Reprimand, ROI No. 1 at 164-66. In the Letter of Reprimand, plaintiff was advised that "[a]busive language is unacceptable and detracts from the agency's ability to maintain a safe and productive work environment." *Id.* SSA also informed plaintiff that she must "treat coworkers and the public with courtesy and respect at all times," and warned plaintiff that if such misconduct persisted, she could be subject "to a more severe disciplinary action." *Id.* at 165. Notably, plaintiff does not allege that the reprimand resulted in a demotion, salary reduction, change in pay grade, or loss of a promotion opportunity.

As to the long-term effect of the Letter of Reprimand, it stated only that it would remain in plaintiff's Official Personnel Folder "for up to two (2) years." ROI No. 1 at 165. But, a performance evaluation that "merely caus[es] a loss of prestige or status," without a more detrimental effect, is not actionable. *James*, 368 F.3d at 377 (citing *Cossette v. Minn. Power & Light*, 188 F.3d 964, 972 (8th Cir. 1999)).

Plaintiff's counsel concedes that, on its own, the optional mid-year assessment "had no arguable adverse effect on the Plaintiff's employment status." *See* Second Morris Declaration, ECF 36 ¶ 9. However, plaintiff argues that the fiscal year 2010 evaluation downgrade constituted an adverse employment action because it rendered plaintiff ineligible for the Recognition of Contribution Award, a cash incentive award for SSA employees given annually based on performance. *See* Am. Compl., ECF 21 ¶¶ 19, 42.

Notably, plaintiff does not allege that the cash award is a benefit to which she was automatically or contractually entitled if she earned a certain performance score. Plaintiff claims only that her performance score of 3.5 rendered her "ineligible" for a particular award. *Id.* ¶ 19. Indeed, with an assessment score of 3.5, plaintiff was not eligible for a Recognition of Contribution Award, because eligibility for the award required an assessment score of at least 4.

Leuchtman Affidavit, ROI No. 2 at 133.   But, the Collective Bargaining Agreement provides only that a certain minimum assessment score of "Successful" is necessary "to be considered" for other awards or promotion.   ROI No. 2 at 328.   And, because plaintiff received a score of 3.5, within the "Successful" range, she remained eligible for consideration for other awards, such as the "Exemplary Contribution or Service Award."   Leuchtman Affidavit, ROI No. 2 at 133; *see* Collective Bargaining Agreement, ROI No. 2 at 328.   Due to budget limitations, however, no incentive awards were given to any employees for fiscal year 2010.   Leuchtman Affidavit, ROI No. 2 at 133; Sulibhavi Affidavit, ROI No. 2 at 118.

The incentive awards bear the indicia of a discretionary bonus.   The Collective Bargaining Agreement does not state that earning a certain assessment score *mandates* that any particular award be given.   Collective Bargaining Agreement, ROI No. 2 at 328-342.   In any event, the denial of a single bonus has only a transitory effect, and when unaccompanied by a more lasting consequence, such as a salary cut or reduction in paygrade, it does not significantly modify one's employment terms.   *See Floyd v. U.S. Dept. of Homeland Sec.*, Civil No. RDB-09-0735, 2009 WL 3614830, at *6 (D. Md. Oct. 27, 2009) (holding that the loss of a bonus, *inter alia*, does not significantly alter the terms or conditions of one's employment); *McClintick v. Leavitt*, Civil No. RDB-05-2880, 2007 WL 927616, at *5 (D. Md. March 26, 2007) (recognizing that the denial of a bonus is not an adverse employment action, in contrast to a quality step increase that would permanently modify the pay scale).

Indeed, in *James v. Booz-Allen & Hamilton, Inc.*, *supra*, 368 F.3d 371, the Fourth Circuit said that a lower performance rating that prevented the plaintiff from being considered for a promotion and rendered him ineligible for a larger bonus did not constitute an adverse employment action.   *Id.* at 377-378.   In so holding, the Fourth Circuit acknowledged that an

evaluation downgrade may affect a term, condition, or benefit of employment, but it failed to recognize a potential decrease in bonus as sufficiently adverse. *Id.*

*Lawrence v. Geren*, Civil No. JFM-07-3455, 2008 WL 4680566, at *1 (D. Md. Oct. 17, 2008), is also instructive. There, the plaintiff alleged that once his supervisor changed, he did not receive a bonus, although he had received a bonus in spite of similarly low evaluation scores in previous years. *Id.* Judge Motz of this court stated that, within the context of a Title VII discrimination claim, "[a]s a general rule, the denial of a bonus does not constitute an 'adverse employment action' . . ." *Id.* He explained: "The mere fact that in prior years plaintiff did receive a bonus despite his low ranking does not preclude a new supervisor . . . from being stricter in his bonus decisions." *Id.*

Similarly, plaintiff cannot depend on her prior performance evaluations or receipt of the award in a prior fiscal year to establish that she was automatically entitled to the benefit for the year in question. As in *Lawrence*, plaintiff's new supervisors, Sulibhavi, Ruiz, and Leuchtman, were not bound by the prior evaluations of her former supervisor, Heath Kelly. *Lawrence*, 2008 WL 4680566, at *1.

Likewise, in *Smyth-Riding v. Science and Engineering Servs., Inc.*, Civil No. WDQ-11-0558, 2014 WL 4899573, at *8 (D. Md. Sept. 29, 2014), Judge Quarles found that denial of a bonus did not amount to an adverse employment action. The plaintiff, Smyth-Riding, an African American woman, was hired by defendant, Science and Engineering Services, Inc. ("SESI"), as the Director of Human Resources in 2007. *Id.* at *1. She was employed to assist with the recruitment and selection of new SESI employees. *Id.* In January 2009, Smyth-Riding was informed by SESI's payroll department that she would not receive a bonus for 2008 and her salary for the coming year would only be increased by 1.7%. *Id.* at *4. On January 6, 2009,

Smyth-Riding informed a SESI executive that she was unsatisfied with her raise and denial of a bonus. A few days later, she met with that executive to discuss her concerns. *Id.* Shortly thereafter, on January 12, 2009, SESI terminated Smyth-Riding, *id.*, stating in her termination letter that SESI no longer felt her personality fit with the needs of the company. *Id.* at *5. Smyth-Riding sued SESI alleging, *inter alia*, that SESI discriminated against her because of her race and gender when it limited her raise to 1.7% of her salary and denied her an annual bonus. *Id.* at *6 n.35, *7.

Judge Quarles determined that the denial of a bonus was not an adverse employment action. He said: "Here, Smyth-Riding was not contractually entitled to a bonus, and she did not allege that SESI policy directly links bonuses with performance ratings . . . .[Thus,] [t]he denial of her 2008 bonus is not an adverse employment action." *Id.* at *8 (internal citations omitted). He recognized that although the denial of a "pay increase may be an adverse employment action," failure to award a discretionary bonus is not. *Id.*

Even under the lower standard for adverse employment actions applicable to Title VII retaliation claims—under which a plaintiff need only establish that the action might have dissuaded a reasonable worker from making or supporting a charge of discrimination—the denial of a bonus has been deemed not sufficiently adverse to support the claim. *See Schamann v. O'Keefe*, 314 F. Supp. 2d 515, 530-31 (D. Md. 2004) (stating, within the context of a Title VII retaliation claim, "[a]s a matter of law . . . the non-receipt of a discretionary bonus does not constitute an adverse employment action"); *see Stoyanov v. Mabus*, Civil No. DKC-07-1953, 2013 WL 1104978, at * 10 (D. Md. March 15, 2013) (same), *aff'd*, 540 Fed. App'x 167 (4th Cir. 2013); *see also Harrington v. Harris*, 118 F.3d 359, 366 (5th Cir. 1997), *cert. denied*, 522 U.S. 1016 (1997); *Rabinovitz v. Pena*, 89 F.3d 482, 488-89 (7th Cir. 1996).

In view of the foregoing, and in the absence of any allegations by plaintiff that the incentive award was part of plaintiff's salary or a benefit to which she was contractually entitled, and no evidence in the record of same, plaintiff cannot rely on the non-receipt of a single, discretionary bonus to establish an adverse employment action.[32]

Assuming, *arguendo,* that Mackall sustained an adverse employment action as a result of the denial of the Recognition of Contribution Award, Title VII serves only to prevent an employer from taking an adverse employment action on a prohibited basis. *See James*, *supra*, 368 F.3d at 375. Here, due to budgetary limitations, no Center for Program Support employees received a bonus for fiscal year 2010. Leuchtman Affidavit, ROI No. 2 at 133; Sulibhavi Affidavit, ROI No. 2 at 118. In this respect, the factual circumstances do not "give rise to an inference" that Mackall was unlawfully deprived of an award due to her race. *See Burdine*, *supra*, 450 U.S. at 253; *Adams*, *supra*, 640 F.3d at 558.

Plaintiff also contends in her Opposition that, because of her race, she was assigned to perform certain audit assignments, a task ordinarily handled by John Markle, a white SSA employee who was on medical leave. *See* Opposition, ECF 32 at 10. Plaintiff complains that, during Markle's absence, instead of assigning the project to the designated back up for that project, Robin Puritz, a white SSA employee, the project was reassigned to plaintiff. *Id*.

As defendant points out, *see* Reply, ECF 33 at 63 n.1, this allegation is procedurally flawed. The Amended Complaint makes no mention of the audit project, and a plaintiff is prohibited from amending the complaint through subsequent motions or briefs. *Zachair, Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997), *aff'd*, 141 F.3d 1162 (4th Cir. 1998). Therefore, any allegations in regard to the audit project assignment cannot be considered.

---

[32] As indicated, I do not resolve any issue as to pretext.

In any event, the assignment of the audit project to plaintiff would not amount to an adverse employment action. In *Tawwaab v. Virginia Linen Service, Inc.*, 729 F. Supp. 2d 757, 784 (D. Md. 2010), the court said: "[A] change in job responsibilities . . . does not constitute a materially adverse action if the new tasks 'are not dirtier, more arduous, less prestigious, objectively inferior, or possessing of any analogous attribute.'"  (Quoting *Stephens v. Erickson*, 569 F.3d 779, 791 (7th Cir. 2009)).[33]

In sum, the evaluation that allegedly resulted in the loss of one bonus and the Letter of Reprimand are not sufficiently adverse to give rise to a Title VII claim. Without an adverse employment action, plaintiff has failed to allege facts sufficient to support a prima facie case of discrimination based on race.

The only remaining question is whether plaintiff is entitled to leave to amend her complaint. Notably, plaintiff has already had an opportunity to amend her allegations in response to an earlier dispositive motion, ECF 4. Among other arguments, defendant previously challenged plaintiff's ability to establish an adverse employment action. *See* ECF 4-1 at 8. Even with notice of this potential deficiency, plaintiff's Amended Complaint failed adequately to present such an allegation. And, this is not a defect subject to cure.

### C. Count II: Unlawful Retaliation

Count II of the Amended Complaint contains a retaliation claim under Title VII. *See* Am. Compl., ECF 21 ¶¶ 35-45. In particular, plaintiff alleges that on June 11, 2010, her co-worker, Tatia Little, received a poor evaluation as an act of reprisal for her testimony at a discrimination hearing on behalf of an SSA employee. *Id.* ¶¶ 12, 17. Plaintiff contends that in

---

[33] The allegation is curious, in any event. This apparently unpleasant responsibility was initially assigned to a white person and the original substitute was also white.

an effort to mask this unlawful retaliation, she also received a downgraded performance evaluation on the same day. *Id.* ¶ 20.

In response, defendant urges dismissal of Count II because, *inter alia*, plaintiff cannot rely on Little's protected conduct to establish her own retaliation claim. ECF 24-1 at 20. Moreover, defendant argues that plaintiff has failed to allege an adverse employment action in connection with her retaliation claim. *See id.* at 18.

Section 2000e-3(a) of 42 U.S.C. provides: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." Thus, Title VII prohibits an employer from retaliating against an employee who exercises her Title VII rights. *See, e.g., Okoli v. City of Baltimore*, 648 F.3d 216, 223 (4th Cir. 2011); *Thorn v. Sebelius*, *supra*, 766 F. Supp. 2d at 600.

The purpose of Title VII's antiretaliation provision is to preserve "unfettered access to statutory remedial mechanisms" for employees who fear reprisal. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997). Thus, an employer violates Title VII by taking an adverse employment action against an employee because that employee exercised his rights under Title VII. In order to establish a prima facie claim of retaliation under Title VII, a plaintiff must demonstrate that (1) she engaged in a protected activity; (2) the employer took an adverse action against the plaintiff; and (3) the protected activity was a "'but-for' cause of her termination and not simply a 'motivating factor.'" *Walker v. Mod-U-Kraf Homes, LLC*, ____ F.3d ____, 2014,

WL 7273031, at *7 (4th Cir. Dec. 23, 2014); *see Okoli*, 648 F.3d at 223; *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004).[34]

As to the first element, the Fourth Circuit has stated that, "in the context of a retaliation claim, a 'protected activity' may fall into two categories, opposition and participation." *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005), *cert. denied*, 547 U.S. 1041 (2006). Activities that constitute participation include making a charge, testifying, or participating in any manner in an investigation, proceeding or hearing under Title VII. *See* 42 U.S.C.A. § 2000e-3(a); *Laughlin*, *supra*, 149 F.3d at 259.

"To fall under the protection of the opposition clause . . . behavior need not rise to the level of formal charges of discrimination. The opposition clause has been held to encompass informal protests, such as voicing complaints to employers or using an employer's grievance procedures." *Armstrong v. Index Journal Co.*, 647 F.2d 441, 448 (4th Cir. 1981) (citation omitted). Put another way, "[a] protected activity is one in which the employee opposes an employment practice on the ground that it violates Title VII." *Johnson v. Giant Food, Inc.*, Civil No. JFM-00-3465, 2000 WL 1831962, *6 (D. Md. Nov. 27, 2000), *aff'd sub nom. Muhammad v. Giant Food Inc.*, 108 F. App'x 757 (4th Cir. 2004); *see Laughlin*, *supra*, 149 F.3d at 259; *Simmons v. Shalala,* 946 F. Supp. 415, 420 (D. Md. 1996), *aff'd*, 112 F.3d 510 (4th Cir. 1997).

"An employer may not retaliate against an employee for participating in an ongoing investigation or proceeding under Title VII, nor may the employer take adverse employment

---

[34] As with a substantive discrimination claim, the *McDonnell Douglas* framework applies at trial. "If a plaintiff 'puts forth sufficient evidence to establish a prima facie case of retaliation' and a defendant 'offers a non-discriminatory explanation' for [the adverse action], the plaintiff 'bears the burden of establishing that the employer's proffered explanation is pretext.'" *Hoyle*, *supra*, 650 F.3d at 337 (quoting *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 551 (4th Cir. 2006)).

action against an employee for opposing discriminatory practices in the workplace." *Laughlin*,
149 F.3d at 259. And, the Fourth Circuit has held that the filing of an EEOC complaint generally
constitutes protected activity. *See, e.g., King v. Rumsfeld*, 328 F.3d 145, 151 (4th Cir. 2003),
*cert. denied*, 540 U.S. 1073 (2003); *see also Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994).

The second element of the prima facie case for retaliation is an "adverse employment
action." In the context of a status-based discrimination claim, the Fourth Circuit has explained:
"An adverse employment action is a discriminatory act that adversely affects the terms,
conditions, or benefits of a plaintiff's employment." *Holland, supra*, 487 F.3d at 219 (internal
quotation marks, citation, and alterations omitted). The Court has also described an "adverse
employment action" as one that "'constitutes a significant change in employment status, such as
hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a
decision causing a significant change in benefits.'" *Hoyle, supra*, 650 F.3d at 337 (quoting
*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).

In a retaliation claim, the standard for an adverse employment action is more lenient than
for a status-based discrimination claim. *Burlington Northern & Santa Fe Ry. Co. v. White*, 548
U.S. 53, 64 (2006) ("Burlington Northern") ("[T]he antiretaliation provision, unlike the
substantive provision, is not limited to discriminatory actions that affect the terms and conditions
of employment."). Nevertheless, Title VII's "antiretaliation provision protects an individual not
from all retaliation, but from retaliation that produces an injury or harm." *Id.* at 67. Even under
the "lower bar" applicable to Title VII retaliation claims, a plaintiff must show that a reasonable
employee would have found the challenged employment action "materially adverse," which
"means it well might have dissuaded a reasonable worker from making or supporting a charge of
discrimination." *Id.* at 68 (internal quotation marks omitted).

The action must be *materially* adverse because "it is important to separate significant from trivial harms." *Id.*; *see Csicsmann v. Sallada*, 211 F. App'x 163, 168 (4th Cir. 2006) ("[T]his is still a heavy burden for the plaintiff: the alleged adverse action must be *material*.") (Emphasis in original). The materiality requirement reflects that Title VII "does not set forth a general civility code for the American workplace" or protect against "petty slights, minor annoyances, and simple lack of good manners." *Burlington Northern*, 548 U.S. at 68 (internal quotation marks omitted); *see Thorn*, *supra*, 766 F. Supp. 2d at 600.

The third element of the prima facie case, that the protected activity was causally connected to the employer's adverse action, requires a plaintiff to "establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, ____ U.S. ____, 133 S. Ct. 2517, 2534, (2013). Mere temporal proximity is not necessarily enough to create a jury issue as to causation. "'Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.'" *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006) (affirming summary judgment where the "actions that led to [plaintiff's] probation and termination began before her protected activity, belying the conclusion that a reasonable factfinder might find that [defendant's] activity was motivated by [plaintiff's] complaints") (quoting *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001)).

As noted, plaintiff's retaliation claim hinges on the protected activity of a third party—the testimony of co-worker Tatia Little, who testified against SSA on behalf of a co-worker at a discrimination hearing. *See* Am. Compl., ECF 21 ¶¶ 35-45. Although plaintiff engaged in the protected act of filing an EEO complaint, that act is not the source of her retaliation allegation.

Plaintiff explicitly stated in her Amended Complaint that, "because of a desire to retaliate against Ms. Little," her employer "subject[ed plaintiff] to a factually unfounded downgrade in its assessment of her performance and in determining to reprimand her in writing for challenging that unfounded assessment." *Id*. ¶ 38.  Plaintiff does not posit that any retaliation was based on her own conduct.  *Id.* ¶ 35-45.  In fact, to support her argument, she attached to her Opposition Little's evaluations, but omits her own.  *See* ECF 32-3; ECF 32-6; ECF 32-7.

Ordinarily, the plaintiff is the person who engaged in the protected activity.  But, in *Thompson v. North American Stainless*, ____ U.S. ____, 131 S.Ct. 863 (2011), the Supreme Court clarified that a plaintiff may also pursue a claim of retaliation on the basis of the protected activity of a third party, depending on the significance of the relationship with the third party and the severity of the retaliatory act.  *Id.* at 867-68.

The plaintiff in *Thompson* sued his employer, North American Stainless ("NAS"), for retaliation, alleging that NAS terminated him as an act of reprisal against his fiancée, who had recently filed an EEO sex discrimination complaint against the company, in violation of Title VII.  *Id.* at 867.  The Supreme Court ruled that, with respect to the plaintiff's retaliation action, the plaintiff could rely on the protected conduct of someone with whom he was closely affiliated—his fiancée.  *Id.* at 868.  Although the Supreme Court refrained from listing a "fixed class of relationships for which third party reprisals are unlawful," it stated that "firing a close family member will almost always meet the *Burlington* standard . . . ."  *Id.*; *see Burlington Northern*, 548 at 64-67.  However, the *Thompson* Court also recognized that reprisal against a "mere acquaintance" would be insufficient.  131 S. Ct. at 868.

In light of *Thompson*, plaintiff may rely on the protected activity of another person to establish a Title VII retaliation claim.  *Thompson*, 131 S. Ct. at 868.  Participation as a witness at

a grievance hearing undoubtedly constitutes protected activity.  42 U.S.C. § 2000e–3(a); *see Laughlin*, *supra*, 149 F.3d at 259.  Nonetheless, in the absence of allegations that plaintiff and Little shared an affiliation, beyond their race and the same chain of supervisors, *Thompson* is distinguishable.

Plaintiff does not allege any facts to establish that she and Little were anything more than "mere acquaintances" or co-workers.  In the absence of a close affiliation with Little, plaintiff cannot rely on Little's protected activity to establish a prima facie case of retaliation.[35]  *Compare McGhee v. Healthcare Services Group, Inc.*, 2011 WL 818662, at *1 (N.D. Fla. Mar. 2, 2011) (denying defendant's motion to dismiss a third party reprisal claim where plaintiff alleged termination was in retaliation for wife's disability complaint) *with Williams v. Daiichi Sankyo, Inc.*, 947 F. Supp. 2d 1234, 1251 (N.D. Ala. 2013) (denying third party reprisal claim where plaintiff relied on protected activity of co-worker with whom he had no familial or substantial social relationship).

Indeed, Mackall's repeated inclusion of and reference to Little's protected activity and performance evaluations is a red herring.  Little is not a plaintiff in this case.  The focus must be on Mackall's personal experience.  *See Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 190 (4th Cir. 2004) (declining to focus on discriminatory treatment of plaintiff's Booz-Allen colleagues when plaintiff himself suffered no such discrimination) (citing *Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742, 761 (4th Cir. 1998) ("[A]n individual plaintiff in a private, non-class

---

[35]  To that end, the EEOC Compliance Manual counsels that Title VII "prohibit[s] retaliation against someone *so closely related to or associated with the person exercising his or her statutory rights* that it would discourage or prevent the person from pursuing those rights." EEOC Compliance Manual § 8‑II(C)(3) (1998) (emphasis supplied).  As the federal agency charged with administering Title VII, the EEOC's statements are instructive.  *See Chevron USA v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844 (1984) ("[C]onsiderable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer . . . .").

action alleging employment discrimination is not litigating common questions of fact, but the discrete question of whether the employer discriminated against the plaintiff in a specific instance."), *vacated on other grounds*, 527 U.S. 1031 (1999)).

Even assuming that plaintiff may rely on Little's protected conduct, plaintiff has nonetheless failed to allege facts sufficient to establish an adverse employment action. Despite the "lower bar" for adverse employment actions applicable to Title VII retaliation claims, plaintiff falls short. *See Wonasue v. University of Maryland Alumni Ass'n*, 984 F. Supp. 2d 480, 492 (D. Md. 2013) (citing *Rock v. McHugh*, 819 F. Supp. 2d 456, 470-71 (D. Md. 2011)). In the retaliation context, a plaintiff must show that the challenged action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 548 U.S. at 68 (2006) (quotation marks and citations omitted). As Judge Paul Grimm of this Court has said: "[N]one of the following constitutes an adverse employment action in a retaliation claim: failing to issue a performance appraisal; moving an employee to an inferior office or eliminating the employee's work station; considering the employee 'AWOL'; or issuing a personal improvement plan, 'an "Attendance Warning,"' a verbal reprimand, 'a formal letter of reprimand,' or 'a proposed termination.'" *Wonasue*, 984 F. Supp. 2d at 480, 493 (quoting *Rock v. McHugh*, 819 F. Supp. 2d 456, 470-71 (D. Md. 2011)). Title VII's "antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *See Burlington Northern*, 548 U.S. at 67.

Mackall's Letter of Reprimand and performance evaluations do not, standing alone, amount to an adverse employment action. As indicated, plaintiff contends that the evaluation downgrade led to her ineligibility for any Recognition of Contribution Award. Nonetheless,

even under the standard for retaliation claims, non-receipt of one discretionary bonus does not qualify as an adverse action. *Schamann*, *supra*, 314 F. Supp. 2d at 531.  Apart from the loss of one bonus payment, plaintiff has not alleged any facts that constitute an employment consequence.  For example, she did not experience a salary reduction, promotion denial, or a change in rank or pay grade.  Thus, plaintiff's allegations are insufficient to survive summary judgment.

As previously noted, plaintiff already received one opportunity to amend her complaint. *See* ECF 4; ECF 21.  Therefore, plaintiff had the chance to cure various pleading defects in connection with her retaliation claim, including ones that SSA had identified in its initial Motion, such as a failure to allege an adverse employment action and an inability to rely on third-party protected activity without a close affiliation.  *See* ECF 4-1 at 16-19.  The defects here are not curable, in any event.

### III.   Conclusion

For the foregoing reasons, defendant's Motion will be granted.  Because amendment would not cure the defects in the two counts of the Amended Complaint, further opportunity to amend is unwarranted.  Therefore, summary judgment will be entered in favor of defendant.

A separate Order follows, consistent with this Memorandum Opinion.


Date:   January 29, 2015                    _____/s/_____
                                            Ellen Lipton Hollander
                                            United States District Judge